PER CURIAM.
This case is before the Court on appeal from the decision reported as Florida Hometown Democracy, Inc. v. Browning, 980 So.2d 547 (Fla. 1st DCA 2008), in which the First District Court of Appeal held that the signature-revocation provisions of section 100.371, Florida Statutes (2007), and associated implementing regulations (i.e., Florida Administrative Code Rules 1S-2.0091 and 1S-2.0095), are unconstitutional in violation of article XI, section 3 of the Florida Constitution, which delineates the citizen-initiative method of amending this foundational document.[1] We thus possess mandatory appellate jurisdiction to resolve this case under article V, section 3(b)(1) of the Florida Constitution.[2] As further explained in our analysis, we affirm the decision of the First District because the politically charged counter-petition revocation campaigns created by these provisions in operation would essentially eviscerate and render meaningless the citizen-initiative process. Such campaigns are neither contemplated nor permitted by the self-executing plain text of article XI, nor are they “necessary to ensure ballot integrity.” State ex rel. Citizens Proposition for Tax Relief v. Firestone, 386 So.2d 561, 566 (Fla.1980) (emphasis supplied).
While the Legislature and the Secretary of State have an obligation to ensure ballot integrity and a valid election process, these parties possess only “limited authority to adopt regulations that affect the initiative process.” Smith v. Coalition to Reduce *1058 Class Size, 827 So.2d 959, 962 (Fla.2002) (emphasis supplied).
We must ensure that any legislation and administrative mies affecting the initiative process are either neutral, nondiscriminatory regulations of petition-circulation and voting procedure, which are explicitly or implicitly contemplated by article XI, or, if otherwise, are “necessary for ballot integrity since any restriction on the initiative process would strengthen the authority and power of the legislature and weaken the power of the initiative process.” Tax Relief, 386 So.2d at 566 (emphasis supplied). In other words, as a condition precedent for validity, legislative and executive measures affecting the initiative process that are neither expressly authorized in article XI, sections 3 and 5, nor implicitly contemplated by these constitutional provisions, must be necessary for ballot integrity. Our precedent further communicates that authentication efforts intended to preserve the integrity of the petition process should be conducted and supervised by neutral election officials rather than biased advocates. See Krivanek v. Take Back Tampa, 625 So.2cl 840, 844-45 (Fla.1993) (holding that voter-registration status-confirmation forms should be “presented directly to a neutral election official rather than a biased advocate” (emphasis supplied)); cf. Crawford v. Marion County Election Bd., 553 U.S. 181, 128 S.Ct. 1610, 1623-24, 170 L.Ed.2d 574 (2008) (upholding Indiana’s neutrally administered, nondiscriminatory voter-ID law) (plurality opinion).
The legislation and administrative rules at issue in this case fail each of these requirements. Ultimately, alteration of the initiative process through measures that are not expressly or implicitly contemplated by article XI, sections 3 and 5 of the Florida Constitution, and are not necessary to ensure ballot integrity, must be accomplished through constitutional amendment. Along with our colleagues at the First Distinct, we remain firmly committed to these well-established legal principles and, accordingly, we affirm the decision of the First District below.
BACKGROUND
Section 100.371, Florida Statutes (2007), and Its Implementing Regulations
During its 2007 regular session, the Legislature adopted chapter 2007-30, Laws of Florida. In relevant part, the act’s title provides that the legislation amended section 100.371, Florida Statutes, by “providing procedures for revocation of a signature on a petition form.” Ch.2007-30, title, at 321-22, Laws of Fla. Effective August 1, 2007, section 25 of chapter 2007-30 amended subsection (1) of section 100.371, Florida Statutes, fashioned a new subsection (6), and amended and transferred the prior contents of subsection (6) to new subsection (7). Despite the gloss presented by the act’s title, these statutory changes did not merely “provide procedures”; rather, they “established” a substantive revocation concept that was previously foreign to Florida’s constitutional petition-circulation process. § 100.371(1), Fla. Stat. (2007); ch.2007-30, § 25, at 339-40, Laws of Fla. As amended, these statutory subsections provide:
(1) Constitutional amendments proposed by initiative shall be placed on the ballot for the general election, provided the initiative petition has been filed with the Secretary of State no later than February 1 of the year the general election is held. A petition shall be deemed to be filed with the Secretary of State upon the date the secretaiy determines that valid and verified petition forms have been signed by the constitutionally required number and distribution of *1059 electors under this code, subject to the right of revocation established in this section.
[[Image here]]
(6)(a) An elector’s signature on a petition form may be revoked within 150 days of the date on which he or she signed the petition form by submitting to the appropriate supervisor of elections a signed petition-revocation form adopted by rule for this purpose by the division [of elections].
(b) The petition-revocation form and the manner in which signatures are obtained, submitted, and verified shall be subject to the same relevant requirements and timeframes as the corresponding petition form and processes under this code and shall be approved by the Secretary of State before any signature on a petition-revocation form is obtained.
(c) Supervisors of elections shall provide petition-revocation forms to the public at all main and branch offices.
(d) The petition-revocation form shall be filed with the supervisor of elections by February 1 preceding the next general election or, if the initiative amendment is not certified for ballot position in that election, by February 1 preceding the next successive general election. The supervisor of elections shall promptly verily the signature on the petition-revocation form and process such revocation upon payment, in advance, of a fee of 10 cents or the actual cost of verifying such signature, whichever is less. The supervisor shall promptly record each valid and verified petition-revocation form in the statewide voter registration system in the manner prescribed by the Secretary of State.
(7) The Department of State may adopt rides in accordance with s. 120.54[, Florida Statutes,] to carry out the provisions of subsections (l)-(G).
§ 100.371(1), (6)-(7), Fla. Stat. (2007) (emphasis supplied).
Pursuant to the bounded rule-making authority conferred by sections 100.371(7) and 120.54, Florida Statutes (2007), the Department of State later promulgated two administrative rules to implement this newly minted concept of signature revocation. See Fla. Admin. R. 1S-2.0091, 1S-2.0095. In sum, the material portions of these rules outline:
1) Subject to the Secretary of State’s format approval of signature-revocation forms, rival political action committees are primarily responsible for drafting, distributing, marketing, and submitting such forms, see Fla. Admin. R. lS-2.0095(l)-(2), (6)-(7), (ID;
2) These entities have a 150-day window following an elector’s signature of a petition-initiative form in which to persuade the elector to revoke his or her signature, see Fla. Admin. R. lS-2.0095(8)(a)2.;[3]
3) Political action committees conducting signature-revocation campaigns have until 5:00 p.m. on February 1 preceding the pertinent general election to obtain the relevant supervisor of elections’ verification of these revocation forms (thus making it practically impossible for initiative proponents to determine whether they have obtained the requisite number and distribution of verified signatures until it is too late to gather, submit, and verify additional signatures), see Fla. Admin. R. 1S-2.0095(10); and
*1060 4) Political action committees conducting signature-revocation campaigns possess a definitive edge in the signature-persuasion process. To wit, once they persuade an elector to revoke his or her signature — /or whatever reason — the elector is forever prohibited from changing his or her mind to, instead, reestablish support for placement of the initiative proposal on the election ballot, see Fla. Admin. R. lS-2.0091(2)(a)2., 1S-2.0095(12).
Therefore, section 100.371 permits, and the administrative rules create, a framework for partisan-fueled counter-petition revocation campaigns, which seek to broadly persuade elector-signatories that they should revoke their prior signatures for any number of asserted reasons, even if illegitimate.
These signature-revocation campaigns are inherently designed to vitiate the effectiveness of the petition-circulation process because those entities conducting revocation campaigns may submit their gathered revocation forms as late as February 1 preceding the relevant general election, which is the same date on which the Secretary of State must verify whether the initiative proponents have gathered enough signatures to secure ballot placement. Hence, initiative proponents will likely receive no notice with regal'd to how many of their gathered, signed petition forms have been revoked until it is too late to gather, submit, and verify additional signatures. In operation, this timing requirement would erase the citizen-initiative process from article XI because, under this framework, it is simply impossible for initiative proponents to ascertain the number of signatures necessary for ballot placement before the time to do so expires. The uncertainty engendered by this pro-revocation timeframe further complicates our constitutional duty to review an initiative proposal’s ballot title and summary, which is triggered by the attainment of a verified-signature threshold. See art. IV, § 10, Fla. Const.; art. V, § 3(b)(10), Fla. Const.; §§ 15.21(3), 16.061(1), Fla. Stat. (2007).
As counsel for Secretary Browning conceded during oral argument, it is readily apparent that such campaigns address far more than alleged instances of signature forgery or fraud. In a targeted fashion, these campaigns seek to change elector-signatories’ minds (for whatever reason) before any ensuing amendment referendum and accompanying public discourse occur pursuant to article XI, sections 3 and 5 of the Florida Constitution. Rather than curbing any alleged fraudulent practices present in the petition-circulation process, these provisions incentivize a race to the bottom in which partisan factions compete to “persuade” Florida’s electors to revoke previously provided signatures. Furthermore, these provisions provide a trump card to one side of this signature-gathering process: Once an elector has signed but later revoked his or her signature, he or she may NEVER again sign the relevant initiative petition and, in a parallel fashion, initiative proponents are forever prohibited from obtaining this elector’s support to place the initiative proposal on the ballot for the next general election. See Fla. Admin. Code R. lS-2.0091(2)(a)2., 1S-2.0095(12) (“Irrevocable Effect of Revocation”); § 104.185(1), Fla. Stat. (2007) (providing that it is a first-degree misdemean- or to knowingly sign an initiative petition on more than one occasion, and failing to provide an exception for electors who previously revoked their signatures); § 104.091, Fla. Stat. (2007) (providing that persons who aid, abet, or advise another concerning violation of the Florida Election Code shall be punished as principals and that co-conspirators and confederates *1061 shall be punished as if they directly committed the relevant offense(s)). Indeed, the record before us contains evidence that frustrated Florida electors were actually duped and misled by a partisan letter into revoking their signatures only to later discover that they would face potential criminal prosecution if they attempted to resign the relevant initiative petition.
Article XI, sections 3 and 5 do not expressly or implicitly contemplate signature revocation, and signature revocation is certainly not necessary to ensure ballot integrity and a valid election process. The restrictions that the instant provisions place on the petition-circulation process substantially reduce the size of the audience that the sponsor can reach, and render it less likely that the sponsor can garner the requisite number of signatures to place the proposed amendment on the ballot, while not passing muster under the constitutionally required level of scrutiny, which obligates the State to affirmatively establish that its restrictions on the initiative process are necessary for ballot integrity. See Class Size, 827 So.2d at 962-64; Tax Relief, 386 So.2d at 566-67.
Our decision today recognizes and fosters the ability of initiative proponents and opponents to advocate on behalf of the signature or non-signature of any initiative proposal. However, consistent with the express and implied dictates of article XI, any such signature-persuasion debate must occur before an elector has signed an initiative petition. The Legislature’s decision to establish a process for initiative opponents to secure a non-rebuttable, unopposed opportunity to persuade electors to revoke their signatures for whatever reason— even if misinformed or uninformed — does not provide the level playing field envisioned by the Secretary and the dissent. Instead, the proverbial deck is stacked in favor of initiative opponents, who could strategically target elector-signatories in a single electoral district or in the state as a whole to revoke their signatures for any reason whatsoever. See art. XI, § 3, Fla. Const, (providing signature numerosity and distribution requirements that apply to electoral “districts respectively and in the state as a whole” (emphasis supplied)).
If, in reality, an elector’s purported “signature” is a forgery, or was the result of fraud,[4] then there is no need to “revoke”[5] the “signature” because such “signatures” are invalid and void ab initio. See Floridians Against Expanded Gambling v. Floridians for a Level Playing Field, 945 So.2d 553, 561-62 (Fla. 1st DCA 2006) (explaining that forged and fraudulent signatures may not be used to satisfy the mandatory signature requirements of article XI, section 3), review dismissed, 967 So.2d 832 (Fla.2007). We conclude that fraudulent signatures may not be used to satisfy the mandatory signature requirements of article XI, section 3 because such false manifestations of assent are not the valid elector “signatures” contemplated by our state Constitution. Furthermore, the Legislature and the judicial branch have already provided alternative mechanisms through which such fraud *1062 may be discouraged, discovered, and remedied.
Florida Hometown Democracy’s Action for Declaratory and Injunctive Relief
In response to these efforts to alter the initiative-circulation process, Florida Hometown Democracy, Inc. (“FHD”),[6] and Lesley G. Blackner, a registered elector of Palm Beach County and FHD’s president and chairperson, filed a circuit-court action on August 22, 2007, against Secretary Browning, in his official capacity, and the Florida Department of State, Division of Elections seeking a declaration that chapter 2007-30, section 25, Laws of Florida, and its implementing administrative rules represent an unconstitutional alteration of the initiative process in violation of article XI, sections 3 and 5 of the Florida Constitution. FHD and Blackner further sought injunctive relief to prevent the enforcement of these provisions. During the circuit-court proceedings, Save Our Constitution, Inc., a political action committee formed to carry out a signature-revocation campaign against FHD’s initiative proposal, intervened pursuant to Florida Rule of Civil Procedure 1.230.[7]
Following the filing of cross-motions for summary judgment, the circuit court entered final summary judgment in favor of Secretary Browning and the Division of Elections on November 27, 2007. See generally Fla. R. Civ. P. 1.510. The circuit court entered this summary judgment based upon three conclusions of law: (1) the Legislature was supposedly owed great deference in this context; (2) the revocation provisions did not change or add to the requirements provided in article XI, section 3 of the Florida Constitution; and (3) the provisions did not strengthen the power of the Legislature vis-a-vis the people. On this same date, FHD and Blackner filed a timely notice of appeal.
The Appeal to the First District
On appeal, the First District reversed the summary judgment and rendered its decision in favor of FHD and Blackner. *1063 Specifically, the district court held that the challenged legislation and implementing rules are neither contemplated by the self-executing plain text of article XI nor necessary to ensure ballot integrity and a valid election process. See Fla. Hometown Democracy, Inc. v. Browning, 980 So.2d 547, 548-50 (Fla.1st DCA 2008). In so holding, the district court correctly examined and applied our controlling precedent in State ex rel. Citizens Proposition for Tax Relief v. Firestone, 386 So.2d 561 (Fla.1980), and Smith v. Coalition to Reduce Class Size, 827 So.2d 959 (Fla.2002). We accordingly affirm the decision of the First District based upon our analysis below.
ANALYSIS
This case presents a question of constitutional interpretation, which is subject to de novo review. See, e.g., Zingale v. Powell, 885 So.2d 277, 280 (Fla.2004). Two primary considerations guide our inquiry and analysis concerning whether these signature-revocation provisions violate article XI of the Florida Constitution. First,
[t]he fundamental object to be sought in construing a constitutional provision is to ascertain the intent of the framers and the provision must be construed or interpreted in such manner as to fulfill the intent of the people, never to defeat it. Such a provision must never be construed in such manner as to make it possible for the will of the people to be frustrated or denied.
Gray v. Bryant, 125 So.2d 846, 852 (Fla.1960). Second, article XI, section 3 is a “self-executing” constitutional provision, which was adopted to bypass legislative and executive control and to provide the people of Florida a narrow but direct voice in amending their fundamental organic law. See Class Size, 827 So.2d at 962; Tax Relief, 386 So.2d at 566. As a result, article XI, section 3 provides an additional check and balance[8] against legislative and executive power, which is not present at the federal level. Compare art. XI, § 3, Fla. Const., with U.S. Const, art. Y. Hence, Secretary Browning and the dissent’s shared assertion that the Legislature and the executive branch possess broad power to regulate the initiative process, subject in all cases to deferential review, is in direct conflict with the very nature of the conferred fundamental right, which acts as a check on such power. See, e.g., Class Size, 827 So.2d at 962 (holding that these parties possess only “limited authority to adopt regulations that affect the initiative process.” (emphasis supplied)). With little to no explanation, the dissent overlooks the necessarily “limited authority” that the Legislature and executive branch may exercise in this area. Id. (emphasis supplied). Here, the broad, substantive authority that the Secretary and our dissenting colleagues would ascribe to the Legislature and executive is simply inconsistent with our precedent.
Simply because the initiative-petition method of amending the Florida Constitution is a state-created constitutional right does not mean that the Legislature possesses unbounded authority to limit the constitutional right. In fact, the Legislature has only limited authority in this area. See Tax Relief, 386 So.2d at 566 (“[T]he initiative petition method to amend the constitution is a fundamental right and any rule or statute which regulates this initiative process must not unduly burden the petitioners’ initiative access.” (empha *1064 sis supplied)); see also Class Size, 827 So.2d at 962; Meyer v. Grant, 486 U.S. 414, 420, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) (“Having decided to confer the right, the State was obligated to do so in a manner consistent with the Constitution.”). It remains a basic legal principle that “no department, not even the legislative, has unlimited power under our system of government.” Sylvester v. Tindall, 154 Fla. 663, 18 So.2d 892, 899 (1944) (quoting State v. City of Stuart, 97 Fla. 69, 120 So. 335, 347 (1929)).
We must consequently ensure that legislation and administrative rules affecting the initiative process are either neutral, nondiscriminatory regulations of petition-circulation and voting procedure, which are explicitly or implicitly contemplated by article XI, or, if otherwise, are “necessa'i~y for ballot integrity.” Tax Relief, 386 So.2d at 566 (emphasis supplied).

Self Executing

Article XI, section 3 is self-executing,[9] which means that this “provision lays down a sufficient rule by ... which the right or purpose which it gives or is intended to accomplish may be determined, enjoyed, or protected without the aid of legislative enactment.” Gray, 125 So.2d at 851 (emphasis supplied). On one hand, constitutional provisions are presumed self-executing to prevent the Legislature from nullifying the will of the people as expressed in their Constitution. See Gray, 125 So.2d at 851. On the other hand, the Legislature may provide additional laws addressing a self-executing constitutional scheme assuming that such laws supplement, protect, or further the availability of the constitutionally conferred right, but the Legislature may not modify the right in such a fashion that it alters or frustrates the intent of the framers and the people. See id. at 851; Notami Hosp. of Fla., Inc. v. Bowen, 927 So.2d 139, 144 (Fla. 1st DCA 2006), affirmed sub nom. Fla. Hosp. Wateman, Inc. v. Buster, 984 So.2d 478 (Fla.2008).
Two fundamental principles of constitutional interpretation reinforce the limited, role[10] that the Legislature and the executive branch occupy with regard to the initiative process: (1) “The Constitution is the charter of our liberties. It cannot be changed, modified or amended by [governmental] fiat. It provides within itself the only method for its amendment,” Thomas v. State ex rel. Cobb, 58 So.2d 173, 174 (Fla.1952); and (2) “When a constitution directs how a thing shall be done, that is in effect a prohibition to its being done in any other way.” Id. at 178 (quoting State ex rel. Murphy v. Barnes, 24 Fla. 29, 3 So. 433, 434 (1888)). For these reasons, we have previously held:
In considering any legislative act or administrative rule which concerns the initiative amending process, we must be careful that the legislative statute or implementing rule is necessa,ry for ballot integrity since any restriction on the initiative process would strengthen the authority and power of the legislature and weaken the power of the initiative process. The delicate symmetric balance of this constitutional scheme must be maintained, and any legislative act regulating the process should be allowed only when necessary to ensure ballot integrity.
*1065 Tax Relief, 386 So.2d at 566 (emphasis supplied); see also Class Size, 827 So.2d at 962-63.

Prior Precedent

In State ex rel. Citizens Proposition for Tax Relief v. Firestone, 386 So.2d 561 (Fla.1980), we held that article XI, section 3’s requirement that the initiative sponsor “file ” its petition with the custodian of state records[11] “containing a copy of the proposed revision or amendment, signed by [the requisite] number of electors ” implicitly supported a mandatory verification of elector signatures by the supervisors of elections, and that signature verification was “necessary to ensure ballot integrity.” Id. at 566-67 (emphasis supplied); cf. § 99.097, Fla. Stat. (2007) (providing for neutral verification of initiative-petition signatures by the supervisors of elections). This holding is logically unassailable: an initiative sponsor has not satisfied the plain text of article XI, section 3 unless it has filed with the custodian of state records the requisite number of valid signatures from actual, qualified electors; otherwise, the proffered “signatures” are not truly signatures in the constitutional sense. See Expanded Gambling, 945 So.2d at 561-62. We further held that statutory law and administrative rules may not contradict the time constraints already provided by article XI, section 5. See Tax Relief, 386 So.2d at 567. In the process of rendering these holdings, we articulated the “necessary to ensure ballot integrity” standard for the express purpose of preserving the “delicate symmetric balance” created by article XI. Id. at 566 (emphasis supplied).
Approximately thirteen years later, in Krivanek v. Take Back Tampa Political Committee, 625 So.2d 840 (Fla.1993), we addressed the effect of a voter-registration list maintenance program[12] on 462 electors who had previously signed a political action committee’s initiative petition to amend the Tampa City Charter. See id. at 841-42. As part of this program, these voters were temporarily removed from the permanent voter-registration books. Consequently, the committee did not possess sufficient signatures to place its initiative issue on the ballot. See id. Take Back Tampa thus involved an analogous attempt to amend a local-government charter by initiative, but did not directly involve the citizen-initiative method of amending the Florida Constitution.
In explaining our decision, we stated:
Given its constitutional underpinnings, the right to petition is inherent and absolute. This does not mean, however, that such a right is not subject to reasonable regulation. Quite the contrary, reasonable regulations on the right to vote and on the petition process are necessary to ensure ballot integrity and a valid election process. See, e.g., State ex rel. Citizens Proposition for Tax Relief v. Firestone, 386 So.2d 561 (Fla.1980) (legislature and secretary of state may impose reasonable regulations on process of petition validation to en *1066 sure expeditious and proper verification of petition signatures).
Id. at 843 (emphasis supplied). We also emphasized that, by its very nature, the maintenance of accurate voter-registration lists is intended “to prevent fraud and to assure integrity in the electoral process,” and that such authentication efforts should be conducted and supervised by neutral election officials rather than biased advocates. Take Back Tampa, 625 So.2d at 845. We ultimately held that voter-registration list maintenance programs are a neutral and “necessary [means] to ensure ballot integrity” and that “an elector whose name has been temporarily removed from the registration books is not a qualified voter for the purpose of executing a petition.” Id. at 843, 845.
Finally, in Smith v. Coalition to Reduce Class Size, 827 So.2d 959 (Fla.2002), we addressed the Legislature’s statutory mandate to include a financial-impact statement on the ballot for all initiative-proposed amendments and revisions. See generally ch.2002-390, Laws of Fla. In the process of analyzing the constitutionality of this legislative act, we extensively quoted Tax Relief and reaffirmed its adoption and articulation of the “necessary to ensure ballot integrity” standard. See Class Size, 827 So.2d at 962-63. Our opinion further emphasized that “[a]rticle XI does not contain any language, either explicit or implicit, regarding the fiscal impact of initiatives.” Id. at 963 (emphasis supplied). We thus (1) built upon the standard originally enunciated in Tax Relief, (2) recognized that the Legislature and executive branch possess only “limited authority to adopt regulations that affect the initiative process,” and (3) clarified that “ballot integrity ... is a prerequisite for any legislative involvement in the initiative process.” Class Size, 827 So.2d at 962, 964 (emphasis supplied). We therefore held that the Legislature’s statutory addition of financial-impact statements upset the “delicate symmetric balance” created by article XI and was not necessary to ensure ballot integrity. See id. at 962-65. However, article XI, section 5 was later amended to require that the Legislature provide, by general law, for financial-impact statements concerning initiative proposals. See art. XI, § 5(c), Fla. Const.
A combined reading of these decisions produces the following guiding precept: We must ensure that any legislation and administrative rules impacting the initiative process are either neutral, nondiscriminatory regulations of petition-circulation and voting procedure, which are explicitly or implicitly contemplated by article XI, or, if otherwise, are necessary for ballot integrity since any restriction on the initiative process strengthens the authority and power of the Legislature and weakens the power reserved by article XI, section 3. Cf. FHD, Inc. v. Browning, 980 So.2d at 548-50 (expressing a similar approach and concluding that “modification of the initiative process through measures which are not necessary to ensure ballot integrity must be accomplished through amendment of article XI”); Dermer v. Miami-Dade County, No. 07-21308-CIV, 2008 WL 2955152, at *19-*20 (SJD.Fla. Aug.l, 2008) (similar) (judgment stayed in part pending decision in Browning v. Fla. Hometown Democracy, Inc., 29 So.3d 1053, 2010 WL 546768 (Fla.2010)). Take Back Tampa does not stand for the proposition that reasonableness in the abstract is the proper measure of whether a regulation is “necessary to ensure ballot integrity.” We clearly rejected such contentions in Tax Relief and Class Size. Instead, Take Back Tampa, merely communicates that neutral, nondiscriminatory regulation of petition-circulation and voting procedure, which ensures compliance with the explicit or *1067 implicit requirements of charter-based or constitutionally-based initiative circulation, preserves ballot integrity. Specifically, in that case, the voter-registration list maintenance program ensured that the purported “electors” were actually qualified and registered electors pursuant to Florida law. Compare art. XI, section 3, Fla. Const, (stating that an initiative petition must be signed by the requisite number of “electors”), with eh. 98, Fla. Stat. (2007) (creating a comprehensive system of voter-registration list maintenance).
Additional explicit or implicit requirements[13] provided by article XI, sections 3 and 5 include, inter alia: (1) the initiative-petition form presented to electors for their signatures must contain an accurate explanation of the initiative proposal, see art. XI, § 3, Fla. Const, (stating that an initiative sponsor must file “a petition containing a copy of the proposed revision or amendment ... signed by [the requisite] number of electors” (emphasis supplied)), see also § 100.371(2), Fla. Stat. (2007); Fla. Admin. R. 1S-2.009 (implementing this requirement); (2) the proffered “signatures” must actually constitute the valid signatures of qualified, registered electors (i.e., no forged, fraudulent, or otherwise invalid signatures are included in attaining the required number of signatures), see art. XI, § 3, Fla. Const, (providing that an initiative petition must be “signed” by the requisite number of “electors”), § 99.097, Fla. Stat. (2007) (providing for signature verification); (3) initiative-petition forms must contain enough information to enable the State to determine whether a signature is valid and whether an elector is duly qualified and registered, see art. XI, § 3, Fla. Const, (providing that an initiative petition must be “signed” by the requisite number of “electors”), see also § 100.371(3)(a)-(d), Fla. Stat. (2007) (implementing this requirement); (4) initiative proposals must comply with the single-subject requirement (save for those “limiting the power of government to raise revenue”), see art. XI, § 3, Fla. Const.; (5) to attain ballot placement, the gathered signatures must satisfy the signature numerosity and distribution requirements, see art. XI, § 3, Fla. Const.; (6) the Legislature must provide, by general law, for corresponding financial-impact statements, see art. XI, § 5(c), Fla. Const.; see also § 100.371(5), Fla. Stat. (2007) (implementing this requirement); (7) initiative sponsors must comply with the notice-publication requirements of article XI, section 5(d); and (8) a uniform process must exist through which initiative sponsors submit initiative petitions to the State to confirm compliance with the explicit and implicit requirements of article XI, sections 3 and 5, see § 101.161(2), Fla. Stat. (2007); § 100.371, Fla. Stat. (2006) (implementing this requirement). The Constitution further provides for our review of an initiative proposal’s ballot title and summary, and we have held that article XI, section 5 implicitly requires accuracy, clear expression, and locational specificity with regard to all amendment or revision proposals. See art. *1068 IV, § 10, Fla. Const.; art. V, § 3(b)(10), Fla. Const.; Armstrong, 773 So.2d at 14-22; see also § 101.161(1), Fla. Stat. (2007) (codifying article XI, section 5’s implicit accuracy requirement).
These observations include and address each aspect of permissible initiative regulation that the dissent incorrectly identifies as unsupported by the Florida Constitution. See dissenting op. at 1080-81. As our analysis clarifies, each of these largely procedural regulations is explicitly or implicitly supported by the text of the Florida Constitution, and each is ultimately administered or supervised by neutral election officials. Conversely, as we explain throughout this decision, these substantive signature-revocation provisions in no way resemble permissible, neutrally administered regulation of the initiative process.
Accordingly, any additional regulation of this “self-executing” process must supplement, protect, or further make available the conferred right, but may not modify the right in such a fashion that it alters or frustrates the intent of the framers and the people. Cf, e.g., Gray, 125 So.2d at 851.

Supplemental Regulation of the Initiative Process Must Either Constitute Neutral, Nondiscriminatorg Regulation of Petition-Circulation and Voting Procedure or be Necessary for Ballot Integrity

When a statute or administrative rule provides a neutral, nondiscriminatory procedural regulation that confirms compliance with the explicit or implicit requirements of article XI, sections 3 and 5, the State is merely exercising its traditional power to regulate election processes, and we have no occasion to question whether such regulation is “necessary to ensure ballot integrity” within the meaning of Tax Relief and Class Size. This is the message conveyed by Biddulph v. Mortham, 89 F.3d 1491 (11th Cir.1996), in which an initiative proponent challenged the constitutionality of Florida’s neutrally administered, procedttral regulations with regard to judicial review of initiative ballot titles and summaries. However, when statutes or administrative rules restrict the initiative process by providing substantive requirements that are foreign to article XI,[14] we must uphold the self-executing nature of these constitutional provisions and ensure that such regulations are necessary for ballot integrity in the strictest sense of the word.[15] See Class Size, 827 *1069 So.2d at 962-64; Tax Relief, 386 So.2d at 566-67. Any other approach would jeopardize the “delicate symmetric balance” inherent in article XI and would fail to provide sufficient protection for the associated rights conferred by article I, sections 4 and 5 of the Florida Constitution. See Class Size, 827 So.2d at 962-64; Tax Relief, 386 So.2d at 566-67.

The Signature-Revocation Provisions of Section 100.371, Florida Statutes (2007), and Its Implementing Regulations Fail to Satisfg These Standards

Meanwhile, Secretary Browning contends that the prevention of signature fraud and forgery supports the Legislature’s creation of this revocation concept, but concedes that revocation campaigns address far more than alleged instances of signature forgery or fraud. In addition, this newly created revocation concept provides a definite advantage to initiative opponents because the applicable regulations establish that if an elector signs a petition but later revokes his or her signature (even if fraudulently induced to do so), he or she may NEVER again sign the relevant initiative petition and, in a parallel fashion, initiative proponents are forever prohibited from obtaining the elector’s support to place the initiative proposal on the ballot for the next general election. See Fla. Admin. Code R. 1S-2.0091(2)(a)2., 1S-2.0095(12) (“Irrevocable Effect of Revocation”). The Legislature has also criminalized the act of knowingly signing an initiative petition on more than one occasion, and has failed to provide an exception for electors who previously revoked their signatures. See § 104.185(1), Fla. Stat. (2007). Relatedly, initiative proponents who aid, abet, or advise an elector with regard to knowingly re-signing an initiative petition following revocation are subject to criminal prosecution as principal offenders. See §§ 104.091, 104.185(1), Fla. Stat. (2007).
Of further concern is the fact that these provisions vest rival political action committees with the primary responsibility for drafting, distributing, marketing, and submitting petition-revocation forms, and render it practically impossible for initiative proponents to determine whether they have obtained the requisite number and distribution of verified signatures until it is too late to gather, submit, and verify additional signatures. See § 100.371(1), (6), Fla. Stat. (2007) (providing that the Secretary of State must verify “that valid and verified petition forms have been signed by the constitutionally required number and distribution of electors” no later than February 1 preceding the relevant general election, while providing that initiative opponents may submit petition-revocation forms by this same date); Fla. Admin. R. lS-2.0095(l)-(2), (6)-(7), (11); Fla. Admin. R. 1S-2.0095(10); cf Take Back Tampa, 625 So.2d at 844-45 (holding that voter-registration status-confirmation forms should be “presented directly to a neutral election official rather than a biased advocate” (emphasis supplied)). These provisions thus decidedly favor initiative opponents and restrict and discourage the advocacy efforts of initiative proponents. The contrary position advanced by our dissenting colleagues is unsupported by the substance of the revocation provisions.
Therefore, the statute and its implementing regulations are not well calculated to reduce perceived instances of forgery and fraud. To the contrary, they provide initiative opponents an unchecked, unopposed opportunity to “persuade” Florida electors by any means, including illicit, to revoke their signatures based upon these opponents’ strident disagreement with the underlying initiative proposals.

*1070
The Signature-Revocation Provisions Are Not Neutral, Nondiscriminatory Regulations of Petition-Circulation and Voting Procedure

We have likely already answered this question, but in accord with our standards, we must first ask whether these signature-revocation provisions are neutral, nondiscriminatory regulations of petition-circulation and voting procedure, which are explicitly or implicitly contemplated by article XI. We hold that they are not. Section 100.371(1), (6)-(7), Florida Statutes (2007), and Florida Administrative Rules 1S-2.0091 and 1S-2.0095 unmistakably create substantive provisions that were previously foreign to article XI[16] and advance an agenda that clearly favors revocation proponents, who are afforded an unopposed opportunity to convince electors to revoke their signatures for whatever reason, legitimate or illegitimate.
In contrast, article XI, sections 3 and 5 contemplate an initiative effort to gather signatures based upon the proposed amendment followed by a ballot referendum assuming that the sponsor timely attains and fulfills each constitutionally based requirement. Placing a signature upon an initiative petition does not signify one’s definitive agreement with a proposed amendment or revision; rather, one is merely agreeing that the proposal is worthy of statewide consideration and discourse for a vote at a later date. If an elector simply changes his or her mind in this regard, he or she remains free to participate in public discussion and to vote against the proposal. See art. XI, § 5(b), Fla. Const.; see also art. XI, § 5(e), Fla. Const, (providing that an initiative proposal must garner the votes of “at least sixty percent of the electors voting on the measure” to secure passage). Alternatively, if an elector’s purported “signature” is a forgery or was the result of fraud, there is no need to “revoke” the “signature” because such “signatures” are invalid and void ab initio. See Expanded Gambling, 945 So.2d at 561-62.

The Signature-Revocation Provisions Are Not Necessary to Ensure Ballot Integrity

Since these provisions are not neutral, nondiscriminatory regulations of petition-circulation and voting procedure, *1071 which are explicitly or implicitly contemplated by article XI, we must address a second inquiry: whether these provisions — despite their lack of implicit or explicit support in article XI — are necessary for ballot integrity. As a general matter, we agree that preserving ballot integrity and preventing fraud in the initiative-circulation process may constitute significant state interests. Nevertheless, the Legislature may not simply incant these aims to shield its actions from judicial inquiry.
Here, we conclude that these legislative and administrative restrictions impermissi-bly burden the initiative-circulation process by (1) substantially reducing the size of the audience that the sponsor can reach and rendering it less likely that the sponsor can garner the necessary number of signatures, while (2) not passing muster under the requisite level of constitutional scrutiny, which requires the State to establish that its restrictions are necessary for ballot integrity. See Class Size, 827 So.2d at 962-64; Tax Relief, 386 So.2d at 566-67. These signature-revocation provisions substantially burden the constitutional rights of initiative proponents and initiative signatories[17] by affording initiative opponents an unopposed, definitive opportunity to “persuade” electors to revoke their signatures for any reason and by any means, even illegitimate. Further, electors who may change their minds concerning an executed revocation-and initiative proponents who support such changes of heart-are subject to potential criminal prosecution regarding efforts to re-sign the relevant initiative petition. See §§ 104.091, 104.185(1), Fla. Stat. (2007).
Signature-revocation campaigns are neither necessary nor appropriate to prevent or reduce alleged instances of fraud or forgery in the petition-circulation process. In fact, the provisions at issue in this case exhibit the potential to increase, rather than decrease, possible fraud by incentivizing a partisan race to “persuade” Florida’s electors to revoke previously provided signatures. Such a practice stands in stark contrast to our rationale in Take Back Tampa, where we communicated that authentication efforts intended to preserve the integrity of the petition process should be conducted and supervised by neutral election officials rather than biased advocates. See Take Back Tampa, 625 So.2d at 844-45.

Alternative Means Already Exist to Address Alleged Forgery and Fraud in the Signature-Gathering Process

The State of Florida has already provided alternative mechanisms through which alleged fraud in the signature-gathering process may be discouraged, discovered, and remedied. For example, chapter 98, Florida Statutes (2007), creates a comprehensive system of voter-registration list maintenance to ensure that only eligible individuals remain registered as Florida electors and that, inter alia, deceased individuals, fictitious persons, mentally incapacitated persons, and convicted felons whose civil rights have not been restored are promptly removed from the statewide voter registration system. Similarly, section 99.097, Florida Statutes (2007), provides for neutral verification of initiative-petition signatures by the supervisors of elections, and section 100.371(3)(a)-(d), which is not affected by our decision today, states that supervisors of elections may only verify a signed initiative-petition form if the form contains — (a) the elector’s original signature, (b) the date on which the elector signed the form, and (c) the elector’s name, street address, county, and voter-registration number or birth date— *1072 and if, at the time of signing, (d) the elector was a qualified, registered elector.
To combat the risk of fraud or forgery, Florida’s Election Code provides that it is a first-degree misdemeanor to sign an initiative-petition form using another person’s name or a fictitious name and further provides that persons who aid, abet, or advise another concerning violation of the Code shall be punished as principals and that co-conspirators and confederates shall be punished as if they directly committed the relevant offense(s). See §§ 104.091, 104.185(2), Fla. Stat. (2007). To facilitate the investigation of such offenses, section 104.43 grants any qualified elector the right to request a special grand-jury investigation preceding any election to determine whether any provision of the Florida Election Code has been violated, and provides that if sufficient grounds exist, the grand jury may issue indictments.
In addition to the criminal offenses present in chapter 104, Florida Statutes (2007), Florida’s general criminal law, which is equally applicable to fraud and forgery, provides that forgery of a public record with an intent to injure or defraud any person is a third-degree felony, and that knowingly making “a false statement in writing with the intent to mislead a public servant in the performance of his or her official duty” is a second-degree misdemeanor. § 837.06, Fla. Stat. (2007). With regard to prosecution and enforcement efforts: section 16.56(l)(a)12., Florida Statutes (2007), vests the Office of Statewide Prosecution with concurrent jurisdiction to investigate and prosecute any criminal offense “involving ... issue petition activities”; section 106.25(1), Florida Statutes (2007), vests the Florida Elections Commission with concurrent authority to investigate violations of chapter 104; section 106.25(6) obligates the appropriate state attorney to investigate and, if necessary, prosecute complaints referred by the Florida Elections Commission; section 106.27(1), Florida Statutes (2007), provides that “[cjriminal proceedings for violations of ... chapter 104 may be brought in the appropriate court of competent jurisdiction [and that] any such action ... shall be advanced on the docket of the court ... and put ahead of all other actions”; section 106.265, Florida Statutes (2007), provides civil penalties for violations of chapter 104; and section 106.27(2) provides for injunc-tive relief against violations of chapter 104.
Finally, the judicial branch provides at least two mechanisms that directly promote ballot integrity and the reduction of fraud. First, well before any referendum, this Court reviews ballot titles and summaries to ensure compliance with the single-subject limitation and to guarantee that Florida’s electors are not misled “with regard to the true effect of a [proposed] amendment” or revision,[18] and such titles and summaries are the primary materials presented to an elector upon a request for his or her signature on an initiative-petition form. See art. IV, § 10, Fla. Const.; art. V, § 3(b)(10), Fla. Const.; §§ 15.21(3), 16.061(1), Fla. Stat. (2007); Fla. Admin. R. lS-2.009(2)(d) (requiring that initiative-petition forms contain a “ballot title that shall not exceed 15 words a,nd [a] ballot summary of the proposed amendment ... that shall not exceed 75 words in length” (emphasis supplied)). No similar judicial review occurs concerning the revocation process at issue in this case. Second, forged and fraudulent signatures may not be used to satisfy the mandatory signature requirements of article XI, see *1073 tion 3,[19] and we have held that “neither verification by the supervisors [of elections] nor certification by the secretary of state immunizes [an initiative] proposal from a judicial action claiming [that] the necessary constitutional requirements have not properly been met.” Tax Relief, 386 So.2d at 567 (emphasis supplied). Thus, at a minimum, there is also a judicial mechanism through which initiative proposals that depend upon forgery or fraud may be excluded from the ballot. Moreover, nothing in our opinion today should be construed as affecting the presumably inherent right of Florida’s electors to provide testimony and properly authenticated admissible evidence that their purported “signatures” were forged or procured through fraud. Cf. art. I, § 1, Fla. Const. (“All political power is inherent in the people. The enunciation herein of certain rights shall not be construed to deny or impair others retained by the people.”).
Therefore, we hold that signature revocation is neither a neutral, nondiscriminatory regulation of petition-circulation and voting procedure, which is explicitly or implicitly contemplated by article XI, nor a process necessary for ballot integrity.
CONCLUSION
As more fully explained in our analysis, we affirm the decision of the First District Court of Appeal in Florida Hometown Democracy, Inc. v. Browning, 980 So.2d 547 (Fla. 1st DCA 2008), because the district court correctly concluded that signature revocation is neither contemplated by the self-executing plain text of article XI, nor is it necessary to ensure ballot integrity and a valid election process. Accordingly, the signature-revocation provisions provided in section 100.371, Florida Statutes (2007), and Florida Administrative Code Rules 1S-2.0091 and 1S-2.0095 violate the Florida Constitution and are void and without effect.
It is so ordered.
QUINCE, C.J., PARIENTE and LABARGA, JJ., concur.
PARIENTE, J., specially concurs with an opinion, in which QUINCE, C.J., and LABARGA, J., concur.
LEWIS, J., concurs in result only.
POLSTON, J., dissents with an opinion, in which CANADY, J., concurs.
PERRY, J., did not participate.

. "The supreme court ... [sjhall hear appeals from ... decisions of district courts of appeal declaring invalid a state statute or a provision of the state constitution.” Art. V, § 3(b)(1), Fla. Const.

. This mirrors the timeframe provided in sec-lion 100.37 l(6)(a), Florida Statutes (2007).

. See Black's Law Dictionary 732 (9th ed.2009) {"fraud in the factum. Fraud occurring when a legal instrument as actually executed differs from the one intended for execution by the person who executes it, or when the instrument may have had no legal existence.”); Id. {“fraud in the inducement. Fraud occurring when a misrepresentation leads another to enter into a transaction with a false impression of the risks, duties, or obligations involved.”).

. See Black’s Law Dictionary 1435 (9th ed.2009) {"revocation, n. 1. An annulment, cancellation, or reversal, usufally] of an act or power.").

. FHD, a non-profit corporation established under chapter 617, Florida Statutes (2007), and a political action committee registered pursuant to section 106.03, Florida Statutes (2007), has been actively engaged in gathering elector signatures for an initiative proposal entitled "Referenda Required for Adoption and Amendment of Local Government Comprehensive Land Use Plans," which would provide Florida’s voters a direct voice in the review and approval of their local governments’ comprehensive land-use plans. We previously provided an opinion to the Attorney General pursuant to article V, section 3(b)(10) of the Florida Constitution advising him that this initiative proposal's ballot title and summary comply with the single-subject requirement of article XI, section 3, and the implicit accuracy requirement of article XI, section 5, codified at section 101.161(1), Florida Statutes (2006). See Advisory Op. to Atl'y Gen. re Referenda Required for Adoption & Amendment of Local Gov’t Comp. Land Use Plans, 938 So.2d 501, 503-06 (Fla.2006); see also Armstrong v. Hanis, 773 So.2d 7, 11 (Fla.2000). FHD's initiative proposal thus possesses a logical oneness of purpose, does not engage in logrolling, does not substantially alter or perform the functions of multiple branches of government, and explains the proposed constitutional amendment's chief purpose in an accurate and informative manner through the use of "clear and unambiguous language.” See Land Use Plans, 938 So.2d at 503-06.

. During oral argument, counsel for Secretary Browning and counsel for FHD agreed that FHD’s initiative proposal is the only proposal currently targeted by a revocation campaign. If signature-revocation campaigns are merely intended as a "neutral,” "empowering,” and "necessary” means of ensuring the authenticity and accuracy of the initiative process, then the Legislature's decision to subject the effectiveness of such an authentication method to the vagaries and partisan advocacy of initiative opponents is all the more curious and questionable.

. Cf. generally The Federalist No. 51 (James Madison) (discussing separation of powers among branches of government).

. "The requirements for exercising this power are set forth in article XI, section 3. If these requirements are met, then the sponsor of an initiative has the right to place the initiative on the ballot.” Class Size, 827 So.2d at 963; see also id. at 962; Tax Relief, 386 So.2d at 566.

. See Class Size, 827 So.2d at 962.

. At the time of our decision in Tax Relief, article XI, section 3 identified "the secretary of state” as the party receiving the petition. See Tax Relief, 386 So.2d at 563. Thereafter, during the 1998 general election, article XI, section 3 was amended to replace "secretary of state” with "custodian of state records.”

. See § 98.081, Fla. Stat. (1991). Such programs ensure that only eligible individuals remain registered as Florida electors by, for example, promptly removing from the voter-registration list deceased individuals, fictitious persons, mentally incapacitated persons, and convicted felons whose civil rights have not been restored. See generally ch. 98, Fla. Stat. (2007).

. Constitutional provisions may include express and implied mandates:
The object of constitutional construction is to ascertain and effectuate the intention and purpose of the people in adopting it. That intention and purpose is the "spirit” of the Constitution — as obligatory as its written word. That spirit ... must be found in those implications and intendments which clearly flow from the express mandates of the Constitution when considered in the light of circumstances and historical events leading up to its adoption, from all of which the purpose of the people in adopting it is to be gleaned.
Cobb, 58 So.2d at 178-79 (quoting Amos v. Mathews, 99 Fla. 1, 65, 115, 126 So. 308, 316 (1930)).

. E.g., signature revocation or financial-impact statements prior to the subsequent addition of article XI, section 5(c). Since signature revocation is entirely foreign to article XI, a severability analysis of this statutory and administrative scheme would be completely inapposite and inappropriate. The Legislature has attempted to substantively alter a constitutional check and balance on its power through a statute and, in such a context, it is not owed judicial deference, great or otherwise. See, e.g., Tax Relief, 386 So.2d at 566 ("The delicate symmetric balance of this constitutional scheme must be maintained, and any legislative act regulating the process should be allowed only when necessary to ensure ballot integrity/' (emphasis supplied)); Cobb, 58 So.2d at 174 ("The Constitution is the charter of our liberties. It cannot be changed, modified or amended by [governmental] fiat. It provides within itself the only method for its amendment."). Moreover, the only portions of section 100.371, Florida Statutes, that our decision holds unconstitutional are those involving signature revocation. Hence, we have already severed these unconstitutional provisions from the remainder of the statute, and the dissent's request for a severability analysis is a total red herring. See dissenting op. at 1074-75.

. See, e.g., Merriam Webster’s Collegiate Dictionary 776 (10th ed.1996) (defining "necessary" as "an indispensible item; ESSENTIAL”).

. "A petition shall be deemed ... filed with the Secretary of State upon the date the secretary determines that valid and verified petition forms have been signed by the constitutionally required number and distribution of electors under this code, subject to the right of revocation established in this section.” § 100.371(1), Fla. Slat. (2007) (emphasis supplied). The circuit court, the Secretary, and our dissenting colleagues' reliance on extraju-risdictional precedent and Florida precedent that is unrelated to article XI's self-executing constitutional provisions is totally misplaced. See, e.g., Town of Gulf Shores v. Coggin, 269 Ala. 233, 112 So.2d 793 (1959) (addressing a statutory right to dissolve an Alabama municipal corporation); Volusia County v. Eubank, 151 So.2d 37 (Fla. 1st DCA 1963) (addressing a petition to relocate a county seat pursuant to chapter 138, Florida Statutes, and applying an arbitrary-and-capricious standard of review); Idol v. Hanes, 219 N.C. 723, 14 S.E.2d 801 (1941) (decision did not involve a constitutional right to petition concerning proposed constitutional amendments; rather, the decision involved a statutoiy right to petition followed by action from a board of county commissioners); In re Initiative Petition No. 2, City of Chandler, 170 Okla. 507, 41 P.2d 101 (1935) (dealing with a statutory right to petition to revoke a city charter); Lynn v. Supple, 166 Ohio St. 154, 140 N.E.2d 555 (1957) (addressing a statutory right of revocation concerning municipal ordinances); Halgren v. Welling, 91 Utah 16, 63 P.2d 550 (1936) (addressing a statutory petition scheme concerning state legislation). Due to this vety serious analytical flaw, which totally overlooks the bulk of our controlling precedent, the circuit court's analysis was not complete or ' 'well-reasoned” as the dissent asserts. Dissenting op. at 1078-79.

. See art. I, §§ 4-5, Fla. Const.; art. XI, § 3, Fla. Const.

. Fla. Dep’t of State v. Slough., 992 So.2d 142, 147 (Fla.2008) (citing Armstrong, 773 So.2d at 16).

. See Expanded Gambling, 945 So.2d at 561— 62.